IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| BONITA R. STILE, ) | |
| ) | |
| Plaintiff, ) | |
| ) | No. 14 C 4379 |
| v. ) | |
| ) | Magistrate Judge |
| CAROLYN W. COLVIN, Acting ) | Maria Valdez |
| Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |
| ) | |

## MEMORANDUM OPINION AND ORDER

Bonita Stile ("Claimant") seeks judicial review of the final decision of the Commissioner of the Social Security Administration ("SSA"), denying her application for Title II Disability Insurance Benefits ("DIB") under the Social Security Act ("the Act"). *See* 42 U.S.C. § 405(g). Pursuant to 28 U.S.C. § 636(c) and Local Rule 73.1, the parties have consented to the jurisdiction of a United States Magistrate Judge for all proceedings, including entry of final judgment. [Doc. No. 8.] Before the court are the parties' cross-motions for summary judgment. [Doc. No. 12, 14.] For the reasons below, Claimant's motion for summary judgement is denied and the Commissioner's motion for summary judgment is granted.

## BACKGROUND

### I. PROCEDURAL HISTORY

Claimant filed her DIB application on May 13, 2010, alleging a disability due to a back injury, arthritis, blindness in the right eye, fibroids, and endometriosis.[1] (R. 156-57, 178.) Her alleged onset date is March 3, 2008. (R. 175.) Her claim was denied initially on August 23, 2010 and again on reconsideration on July 15, 2011. (R. 97-98.) Claimant requested and was granted a hearing before an Administrative Law Judge ("ALJ") which took place on January 18, 2013. (R. 40-96, 113-14.) On February 1, 2013, the ALJ issued a decision finding Claimant not disabled and thus not entitled to DIB. (R. 16-35.) When the Appeals Council ("AC") denied review on April 10, 2014, the ALJ's decision became the final decision of the Commissioner. (R. 1-6); *Schomas v. Colvin*, 732 F.3d 702, 707 (7th Cir. 2013). Claimant filed this action seeking judicial review. *See* 42 U.S.C. § 405(g).

### II. MEDICAL HISTORY

Claimant alleges that she has been disabled and unable to engage in Substantial Gainful Activity ("SGA") since March 3, 2008. (R. 175.) On January 10, 2008, Claimant arrived at St. Margaret Mary for a screening. (R. 289-92.) An examination of her chest and lungs returned normal results. (R. 289.) After her knees were examined, the attending physician noted no evidence of fracture or dislocation and found that Claimant has intact structures on both of her knees. (R.

---

[1] Endometriosis is a "condition in which tissue grows outside the uterine wall, chiefly on the ovaries and pelvis, causing pain." *Dorland's Medical Dictionary* available at http://www.dorlands.com (last visited May 10, 2017). [Hereinafter "Dorland's"].

2

290.) A screening of her lumbar spine returned normal results as well, and it was noted that she did not suffer from spondylolysis of the spine. (R. 291.)

Claimant has also been treated at Oak Forest Hospital ("Oak Forest") since June 29, 2010. (R. 354.) She first was admitted to Oak Forest's emergency room on that date, due to increasing back pain and chest pains. (R. 340-44.) She was treated and a physical evaluation indicated that her heart, aorta, and lung fields were normal. (*Id.*) She was discharged in stable condition that same day, and was noted as "fe[eling] much better." (R. 341.) Claimant returned to the Oak Forest emergency room on September 28, 2010 due to congestion. (R. 345-48.) She was treated and again discharged in stable condition that same day. (R. 346.) Claimant again returned to Oak Forest on May 10, 2011 because she had a fainting episode. (R. 350.) An evaluation showed a normal heart and normal lungs. (*Id.*)

On January 13, 2012, she had surgery on her right foot to remove a bunion and returned to Oak Forest throughout January and February 2012 for follow-up appointments. (R. 429-33, 435-36, 438-40, 443-45.) Claimant also complained of joint pains during her February 7, 2012 Oak Forest visit and was prescribed Naproxen. (R. 424-27.) She returned on February 23, 2012 because of recurrent major depressive symptoms. (R. 420-23.) The physical and mental examination performed at Oak Forest yielded normal results and she was advised to continue her medication plan of Trazadone, Wellbutrin, and Ambien. (R. 422.)

On February 24, 2012, a CT scan of Claimant's cervical spine was taken and showed normal alignment but mild to moderate stenosis in certain areas of the

3

spine. (R. 418.) During a follow-up appointment on March 30, 2012, it was noted that Claimant's depression was improving and she was again advised to continue with her medication. (R. at 406-09.) On July 12, 2012, Claimant reported to Oak Forest because she had not taken her medication for two weeks because she had finished the prescription. (R. 470-72.) She claimed to have feelings of worthlessness, anxiety, and anger. (R. 470.) Claimant stated during her evaluation that once she is back on her medication, she is less irritable and is able to sleep much better. (*Id.*)

On August 6, 2012, Claimant likewise received an ultrasound at Oak Forest that showed abnormal results in her uterus and she was referred to a gynecologist. (R. 476.) On November, 19, 2012, during a follow-up appointment, Claimant was evaluated for abnormalities associated with endometriosis. (R. 452.) Another gynecologist appointment was advised. (*Id.*) On September 14, 2012, during a follow-up appointment, Claimant also complained of worsening vision. (R. 459-61.) She was diagnosed with glaucoma and instructed to return for a follow-up appointment. (R. 461.)

Claimant also underwent other medical evaluations during this period. Claimant was evaluated by Dr. M.S. Patil of the Bureau of Disability Determination Services ("DDS") on May 23, 2011. (R. 359-63.) Dr. Patil's mental status examination resulted in generally normal and fair findings, except that Claimant may be somewhat hostile and guarded. (R. 361.) After a physical examination, Dr. Patil noted that Claimant had no obvious deformities of the spine. (*Id.*)

On June 17, 2011, Claimant was seen by licensed psychologist Jeffrey Karr who noted that she did not exhibit physical problems or motor difficulties. (R. 367.) Mr. Karr concluded that during the exam, she did not show visible signs of physical distress, obvious cognitive problems, or gross psychopathology. (R. 369.)

On July 12, 2011, Dr. Keith Burton also completed his Psychiatric Review Technique Form ("PRTF") for alleged affective disorders under 12.04 and substance addiction disorders under 12.09 of the listed impairments. (R. 370.) As far as functional limitations, Dr. Burton noted that Claimant would be mildly limited in her daily activities and her ability to maintain social functioning. (R. 380.) He opined that she would be moderately limited in maintaining concentration, persistence, and pace. (*Id.*) He concluded that the level and persistence of Claimant's condition is "partially credible" due to reports of her social interactions and daily activities. (R. 382.)

Dr. Burton also completed a mental Residual Functional Capacity ("RFC") assessment and found Claimant to be moderately limited in the ability to understand, remember, and carry out detailed instructions. (R. 384-86.) He also found her moderately limited in her ability to complete a normal workday without interruptions, get along with coworkers without distraction, and respond appropriately to changes in the work setting. (R. 385.) Dr. Burton noted that while Claimant alleges disability due to depression, her medical records document a "single" instance of depression with treatment, and no other "gross cognitive problems" were suggested by the evidence. (R. 386.)

5

Similarly, on July 14, 2011, Dr. David Mack conducted physical RFC assessment. (R. 388-95.) Dr. Mack established that Claimant could lift 50 pounds occasionally and 20 pounds frequently. (R. 389.) He found Claimant capable of standing, walking, and sitting for approximately six hours in an eight hour workday. (*Id.*) He found Claimant had unlimited ability to push and pull. (*Id.*) Dr. Mack also opined that Claimant had full motor strength and full range of motion, except that her lumbar spine flexibility was 70/90. (*Id.*) Her grip strength was 5/5 for both hands and she had normal gait, and could ambulate without an assistive device. (*Id.*) Dr. Mack concluded that Claimant's testimony was partially credible because of her ability to carry out daily activities such as preparing food and taking care of herself. (R. 395.)

On January 10, 2012, Dr. William Houser completed a medical source statement for Claimant. (R. 564-69.) Dr. Houser opined that Claimant could occasionally lift and carry 11 to 20 pounds and frequently lift up to ten pounds. (R. 564.) He further opined that Claimant would be able to sit, stand, and walk for six hours in an eight-hour workday. (R. 565.) Dr. Houser stated that Claimant does not require the use of a cane to ambulate and found it not medically necessary. (*Id.*) He found Claimant able to use her hands to reach overhead frequently and she had no issues handling or fingering. (R. 566.) Dr. Houser found Claimant limited by her vision but opined that she would have no difficulty avoiding hazards in the workplace, reading small print, or viewing a computer screen. (R. 567.) He further opined that Claimant could tolerate most environmental hazards in the workplace

6

but can never work with unprotected heights. (R. 568.) Finally, Dr. Houser concluded that Claimant was not limited in performing daily activities such as shopping, walking to and from her home, using public transportation, preparing meals, and taking care of her personal hygiene. (R. 569.)

## ANALYSIS

Claimant offers three arguments: first, she claims that the ALJ failed to properly analyze her credibility and RFC. (Pl. Mot. at 8.) Second, she contends the ALJ erroneously relied on the agency's psychological evaluation. (Pl. Mot. at 12.) Finally, she argues that the ALJ did not meet his burden at Step Five of the sequential evaluation. (Pl. Mot. at 13.)

When the District Court reviews the decision of an ALJ, the court reviews to determine whether the ALJ's decision is supported by substantial evidence in the record and whether the ALJ applied the correct legal standards in reaching his decision. *Sims v. Apfel,* 530 U.S. 103, 106–07 (2000); *Nelms v. Astrue,* 553 F.3d 1093, 1097 (7th Cir. 2009). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion" and a "mere scintilla" of evidence is not enough. *Richardson v. Perales,* 402 U.S. 389, 401 (1971); *Scott v. Barnhart,* 297 F.3d 589, 593 (7th Cir. 2002). The court may not, however, "displace the ALJ's judgment by reconsidering facts or evidence, or by making independent credibility determinations." *Elder v. Astrue,* 529 F.3d 408, 413 (7th Cir. 2008). The "findings of the Commissioner as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). Even when there is adequate

7

evidence in the record to support the decision, the findings will not be upheld if the ALJ does not "build an accurate and logical bridge from the evidence to the conclusion." *Berger v. Astrue,* 516 F.3d 539, 544 (7th Cir. 2008). If the Commissioner's decision lacks evidentiary support or adequate discussion of the issues, it cannot stand. *Villano v. Astrue,* 556 F.3d 558, 562 (7th Cir. 2009).

A.  **Credibility Determination and RFC**

Claimant begins by contesting the validity of the ALJ's credibility determination on several grounds. Before proceeding to Claimant's argument, the court acknowledges the new Social Security Ruling ("SSR") that went into effect on March 28, 2016, which eliminated the term "credibility" from the ALJ's review of a claimant's symptoms. *See* SSR 16-3P, 2016 WL 1119029, at *1 (March 28, 2016) (superseding SSR 96-7p). Under the new SSR, the ALJ is required to test the consistency of Claimant's statements in evaluating the severity of her symptoms by weighing familiar factors including Claimant's daily activities, medications, treatment attempts, etc. SSR 16-3p *6-*7. Thus, the court will assess whether the ALJ appropriately evaluated the severity of Claimant's symptoms to determine whether the symptoms limit her ability to perform work.

(i) **ALJ's usage of Boilerplate Language**

Claimant first challenges the ALJ's usage of boilerplate language that "the Seventh Circuit has repeatedly described as 'meaningless boilerplate' because it fails to link the conclusory statements made with objective evidence in the record" and does not "explain, or direct a reviewing court to, what the ALJ relied on when

8

making his determination." *Bjornson v. Astrue*, 671 F.3d 640, 645 (7th Cir. 2012); *Parker v. Astrue*, 597 F.3d 920, 922 (7th Cir. 2010). However, as correctly argued by the Commissioner, the simple fact that an ALJ used boilerplate language does not automatically undermine his ultimate conclusion if he otherwise points to information that justifies his determination. *See Shideler v. Astrue*, 688 F.3d 306, 311–12 (7th Cir. 2012); *Getch v. Astrue*, 539 F.3d 473, 483 (7th Cir. 2008); *see also Pepper v. Colvin*, 712 F.3d 351, 367-68 (7th Cir. 2013).

Here, while the Claimant is correct that the ALJ used boilerplate language, it is clear that the ALJ used this boilerplate language rhetorically as a summary of the relevant points of law, which the ALJ followed with lengthy paragraphs discussing Claimant's testimony, laboratory and diagnostic tests, and other medical findings. (R. at 32.) These paragraphs also contained logical analysis, supporting the ALJ's reasoning and supported the ALJ's conclusion with substantial evidence. (*Id.*) Thus, the ALJ's use of boilerplate was not reversible error. *See Pepper*, 712 F.3d at 367-38 (inclusion of boilerplate language does not make an ALJ's credibility determination patently wrong, so long as an ALJ bolsters their credibility finding with sufficient evidence).

**(ii) ALJ's Equation of Daily Living with Ability to Work**

Claimant further contends that the ALJ's credibility finding was tainted by the ALJ's impermissible over-reliance on the Claimant's testimony about her daily activities. (Pl. Mot. at 9.) She points to the ALJ's reference to her June 18, 2010 function report, in which she wrote that she was able to tend to her personal care,

9

clean, go grocery shopping, and go to church. (R. 26-27, 211-12.) Claimant's argument is unavailing. From an examination of the record, the ALJ reasonably found that Claimant's physical abilities did not support Claimant's allegations of disability, and appropriately weighed this fact when finding Claimant not disabled. *See Prochaska v. Barnhart,* 454 F.3d 731, 737 (7th Cir. 2006) (ALJ appropriately considered diverse factors in his determination, including the hearing testimony and objective medical records, even though all of claimant's allegations were not discussed in the ALJ's opinion).

First, Claimant refers to portions of the same June 18, 2010 function report which indicate that she required assistance with meals, chores, and going shopping. However, this citation to the record highlights the inconsistencies in Claimant's own statements regarding her daily activities. Indeed, during the hearing, Claimant testified that she was able to go grocery shopping independently, enjoyed watching television, and reading the Bible regularly. (R. 27, 29, 32, 55; citing R. 360, 366, 389, 567.) The ALJ's examination of the Claimant's inconsistencies was supported by citation to the record, and the ALJ was not wrong to consider Claimant's conflicting statements in rendering his decision. *See Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000) (minor testimonial discrepancy combined with hearing officer's observations of the witness during testimony provides small support for a finding of incredibility).

Second, a claimant's daily activities are but one factor for the ALJ to consider. Here, the ALJ provided other reasons for finding that Claimant's

allegations regarding her arthritis, back pains, and vision problems are not supported by the medical record. Specifically, the ALJ noted Claimant's treatment history including: the same-day discharges from Claimant's June 29, 2010 and September 28, 2010 Oak Forest Emergency Room visits; the normal results from the September 16, 2010 vision and spine evaluation at Aunt Martha's Clinic; and the findings of normal range of motion, lack of deformity, swelling, or tenderness, and acuity of vision resulting from Dr. Patil's May 23, 2011 examination. Similarly, the ALJ discussed the diminished flexion range in Claimant's lumbar spine, but stated that he accommodated for this limitation in his RFC assessment. (R. 26, 28-29; citing R. 330, 341; 345-46; 359-63.)

Next, Claimant contends the ALJ did not make a determination about the level of pain she experienced and failed to consider the effects of her pain on her daily activities. (Pl. Mot. at 10.) However, from a reading of the transcript, the ALJ directly inquired about the Claimant's level of pain during the hearing. (R. 54-57.) From the ALJ's discussion of the pain it also appears that the ALJ explicitly accounted for the testimony of Medical Examiner ("ME") Dr. Houser, who opined that Claimant's radiating pain was not definitively linked to her arthritis, nor was her claim of muscle spasms positively identified as such. (R. 87-88.)

The ALJ's examination considered things in addition to pain. Specifically, the ALJ also noted that Dr. Burton's mental RFC assessment confirmed Claimant's mild limitations in her ability to perform activities of daily living and social functioning. (R. 32, 380, 384-86.) Furthermore, according to Dr. Mack's physical

11

RFC assessment, Claimant would be able to engage in medium exertional work without any postural, manipulative, or environmental limitations. Despite such findings, the ALJ afforded Dr. Mack's opinion little weight and *further* accommodated Claimant by assessing her RFC with greater physical and environmental limitations than those reasonably attributed to her disability. (R. 32-33, 388-95.)

Specifically, in assessing her symptoms, the ALJ did not disbelieve that Claimant was experiencing pain or that she was disabled. Contrary to Claimant's argument, a fair reading of the opinion indicates that the ALJ acknowledged the limitations that Claimant faced but found that the restrictions imposed by her impairments were not severe enough to disable her to the extent of her allegations. *See Mitze v. Colvin*, 782 F.3d 879, 881 (7th Cir. 2015) (noting that ALJ had not denied that claimant was in pain but instead "didn't believe that the pain was severe enough to disable her to the extent she claimed."). As such, because the ALJ considered a variety of factors and attributed a higher degree of limitation when assessing the extent of her disability when making the Claimant's RFC determination, the ALJ provided the requisite "logical bridge" between the evidence and his conclusions. *Terry v. Astrue*, 580 F.3d 471, 475 (7th Cir. 2009).

Claimant also argues that the ALJ failed to properly analyze the aggregate effect of her combined impairments, including her vision loss, degenerative disc disease, recent right foot surgery, arthritis, depression, endometriosis, and a history of polysubstance abuse. (Pl. Mot. at 11.) This argument is unavailing. The Seventh

12

Circuit requires only that the ALJ acknowledge having considered the aggregate effect, as long as the ALJ discusses each symptom. *See Lott v. Colvin*, 541 F. App'x 702, 706 (7th Cir. 2013).

From a review of the record, the ALJ chronicled Claimant's impairments, even the non-severe impairments, and concluded that while limiting, they do not significantly restrict her ability to perform basic work activities. Thus, the ALJ's statements that he examined the combined impairments at step three and considered all the impairments at step four are sufficient to show that the ALJ accounted for the aggregate effect of her symptoms. *Lott*, 541 F. App'x at 706.

Claimant also maintains that the ALJ should have explained how her combined impairments did not prevent employment. However, as the Commissioner correctly states, the ALJ must only consider the aggregate effect of impairments to the extent that they are supported by the medical evidence on record. It is Claimant who bears the burden of proving that she is disabled, and she failed to present any medical to support that her impairments, in combination or singularly, create more limitations than the ALJ's RFC assessment. *Castile v. Astrue*, 617 F.3d 923, 927 (7th Cir. 2010); *see also Lott*, 541 F. App'x at 706 (The ALJ was not wrong to question Lott's subjective complaints of disability given the number of daily activities she performed, the level of exertion necessary to engage in those activities, and the paucity of medical records confirming a limited ability to work); 42 U.S.C. § 423(d)(5)(A); 20 C.F.R. § 404.1512(a).

Examining the applicable evidence in the record; though the ALJ determined that Claimant's symptoms did not limit her ability to perform work-related activities and provided several reasons for this finding, not all the evidence fell within Claimant's eligibility period starting from her alleged onset date of March 3, 2008 through her date last insured ("DLI") of June 30, 2011. (R. 22.) The Commissioner correctly argues that, as a matter of administrative procedure, the Claimant must provide, and the ALJ must consider, evidence to support her claim of disability on and after her onset date of March 3, 2008 but also prior to her DLI of June 30, 2011. *See Eichstadt v. Astrue*, 534 F.3d 663, 666 (7th Cir. 2008); *Milliken v. Astrue*, 397 F. App'x 218, 225 (7th Cir. 2010) ("[i]t is Milliken's burden to produce medical evidence to support her claim of disability prior to her [DLI]"); *Wilder v. Chater*, 64 F.3d 335, 337 (7th Cir. 1995); *see also Estok v. Apfel*, 152 F.3d 636, 640 (7th Cir. 1998) ("Estok must establish through other evidence an actual disability during the insured period.").

This is especially pertinent for Claimant, since her allegations of pain include post-surgery pains in her right foot, though her procedure was performed in January 2012, well after her DLI. Evidence outside the relevant disability period such as this should be considered "to the degree they shed light on impairments and disabilities from the relevant insured period." *Million v. Astrue*, 260 F. App'x 918, 921-22 (7th Cir. 2008); *see also Meredith v. Bowen*, 833 F.2d 650, 655 (7th Cir. 1987). Here, the records relied on by Claimant do not relate back, as Claimant's

14

medical records indicate she made no complaints of foot pains prior to June 30, 2011.

However, despite Claimant's expired DLI notwithstanding, the ALJ still considered treatment notes through 2012, and he found that the evidence detracted from Claimant's allegations of significant physical and mental restrictions. *See Parker*, 597 F.3d at 925 ([ALJ] must consider all relevant evidence, including the evidence regarding the plaintiff's condition at present.) Despite the fact that Claimant produced evidence post-dating her DLI, the ALJ reasonably discussed all of her medical records and provided good reasons for his conclusion. In addition, even after consistently normal medical findings, the ALJ accommodated for her physical and mental limitations in the RFC. (R. 31.)

B. **Agency Psychological Evaluation**

Claimant next argues that the ALJ erred in affording Dr. Burton, the state agency psychologist, great weight because "consultative opinions are generally afforded less weight than treating source opinions." (Pl. Mot. at 12.) While true, a review of Claimant's medical evidence shows that she had not established a relationship with a treating physician, nor does Claimant proffer one for the court to consider. The ALJ analyzed the evidence before him and complied with the agency's regulations which require that "the ALJ 'not ignore the opinions of state agency physicians and [he] must explain the weight given to the opinions in their decisions.'" *McKinzey v. Astrue*, 641 F.3d 884, 891 (7th Cir. 2011); 20 C.F.R. § 404.1527(f).

15

Furthermore, Claimant contends that Dr. Burton's opinion does not provide the full picture, as his evaluation was submitted on July 12, 2011, and she has had subsequent psychiatric visits for her mental symptoms. This brings the court back to the issue of her relevant disability period and the requirement that the evidence relate to the Claimant's condition "during the relevant time period encompassed by the disability application under review." *Bush v. Astrue*, 571 F. Supp. 2d 866, 874 (N.D. Ill. 2008). The evidence is simply not relevant for the period between March 3, 2008 and June 30, 2011. Even so, contrary to Claimant's argument that the ALJ ignored a line of evidence, the ALJ actually considered Claimant's depression independently. It may have not been the result that Claimant wanted, but ultimately, the ALJ found that the medical evidence indicates that her depression did not preclude gainful employment. (R. 31.)

Though Claimant argues that the ALJ should have ordered an additional consultative examination for the subsequent records, an ALJ need re-contact medical sources only when the evidence received is inadequate to determine whether the claimant is disabled. *See* 20 C.F.R. § 404.1512(e). Here, the evidence was adequate for the ALJ to conclude that even with limitations, Claimant was able to engage in work existing in the national economy, and the ALJ acted within his discretion in deciding not to request a consultative examination for the subsequent evidence. *See Skarbek v. Barnhart*, 390 F.3d 500, 504 (7th Cir. 2004); *Nelms*, 553 F.3d 1093 at 1098 (even when the ALJ has a duty to expand record, speculation

that additional evidence could have been obtained does not warrant remand); *see also* 20 C.F.R. § 404.1527(f)(2)(iii).

C.   **Step Five of the Sequential Evaluation**

Finally, Claimant argues that the ALJ erred at step five of the sequential evaluation. (Pl. Mot. at 13-14.) At the fourth and fifth steps, the ALJ must consider an assessment of Claimant's RFC, which is an assessment of what work-related activities she can perform despite her limitations. *Dixon v. Massanari*, 270 F.3d 1171, 1178 (7th Cir. 2001); 20 C.F.R. § 404.1545(a)(1)("Your [RFC] is the most you can still do despite your limitations."). The RFC must be assessed based on all the relevant evidence in the record. 20 C.F.R. § 404.1545(a)(1); *Young v. Barnhart*, 362 F.3d 995, 1000-01 (7th Cir. 2004). A Vocational Expert's ("VE") testimony can satisfy this burden only if that testimony is reliable. *Britton v. Astrue*, 521 F.3d 799, 803 (7th Cir. 2008).

Claimant's main contention is that the ALJ failed to resolve a conflict in the VE's testimony and therefore he could not have relied on the VE's findings. (Pl. Mot. at 11.) The ALJ's RFC assessment limited Claimant to understanding, remembering, and carrying out simple instructions. (R. 26.) During the hearing, the VE opined that with such limitations, Claimant would be able to carry out the duties of a production assembler, small parts assembler, and an electronics worker. (R. 34, 92-93.) Claimant argues that under the Dictionary of Occupational Titles ("DOT"), these positions involve a reasoning level of two, indicating that the person must "apply commonsense understanding to carry out detailed but uninvolved

17

written or oral instructions…[d]eal with problems involving a few concrete variables in or from standardized situations," which is incongruous with the ALJ's determination that Claimant can only follow "simple" instructions and make "simple" decisions.

Under SSR 00–4P, an ALJ has an "affirmative responsibility" to ask whether a VE's evidence "conflicts with information provided in the DOT," before relying on that evidence to support a determination of non-disability. *See* SSR 00-4P *4 (S.S.A.), 2000 WL 1898704; *Prochaska*, 454 F.3d 731 at 735. Here, the ALJ satisfied this first step by asking the VE if his testimony was consistent with the DOT. (R. 93-94). The VE answered yes, though erroneously. If evidence from a VE appears to conflict with the DOT, SSR 00–4p requires further inquiry and an ALJ must obtain a reasonable explanation for the apparent conflict. *See* SSR 00–4p * 5. A conflict is apparent if it is "so obvious that the ALJ should have picked up on [it] without any assistance." *Weatherbee v. Astrue*, 649 F.3d 565, 570 (7th Cir. 2011).

The Commissioner argues that Claimant failed to show how this conflict should have been apparent to the ALJ and the court agrees. *See Overman v. Astrue*, 546 F.3d 456, 463 (7th Cir. 2008) (Overman has to argue that the conflicts were obvious enough that the ALJ should have picked up on them without any assistance, for SSR 00–4p requires only that the ALJ investigate and resolve apparent conflicts between the VE's evidence and the DOT.) More significantly, the fact that the VE assigned positions with a reasoning level higher than what the ALJ assessed for Claimant's RFC is not enough to show that she has been harmed by the

18

ALJ's failure to make such an inquiry. In fact, as the Commissioner correctly points out, the Seventh Circuit has found that even workers who are markedly limited in their ability to understand, remember, and follow detailed instructions might still be able to perform jobs requiring level 3 reasoning development. *See Sawyer v. Colvin*, 512 F. App'x 603, 611 (7th Cir. 2013); *see also Weatherbee*, 649 F.3d 565 at 572 ("that there are a large number of production jobs that are beyond the capabilities of sedentary, non-skilled laborers is not, on its own, sufficient to establish an apparent conflict between the VE's testimony and the DOT.").

Finally, the SSR and the DOT "use markedly different standards for addressing a claimant's ability to understand, remember, and concentrate on job duties." *See Thompkins v. Astrue*, No. 09 C 1339, 2010 WL 5071193, at *10 (N.D. Ill. Dec. 6, 2010); citing *Masek v. Astrue*, No. 08 C 1277, 2010 WL 1050293, at *22 (N.D. Ill. Mar. 22, 2010). "The regulations divide such abilities into only two categories— 'short and simple instructions' and 'detailed' or 'complex' ones—whereas the DOT uses a more graduated scale ranging from one to six that does not easily accommodate itself to the regulations' simple/complex dichotomy." *Thompkins*, No. 09 C 1339, 2010 WL 5071193, at *10; 20 C.F.R. § 416.969a(c)(1)(iii); DOT at 1010–1011. Thus, a task may be "simple" under the regulations and still involve the kind of "detailed" tasks required under Level 2 reasoning. Based on this variation between the regulations and the DOT, *Masek* and other courts have found that Level 2 is not inconsistent with a claimant's limitation to simple, routine tasks. *See*

*Thompkins*, No. 09 C 1339, 2010 WL 5071193, at *11. The ALJ therefore did not err because he did not further inquire into the alleged inconsistency.

## CONCLUSION

For the foregoing reasons, Claimant's motion for summary judgement is denied and the Commissioner's motion for summary judgment is granted.

**SO ORDERED.**                                    **ENTERED:**

**DATE:**    **July 7, 2017**                                   _____
                                                                        **HON. MARIA VALDEZ**
                                                                        **United States Magistrate Judge**